UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  5:16-cv-00335-HNJ |
| | ) | |
| UNITED LAUNCH ALLIANCE, LLC, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION AND DISMISSAL ORDER

This civil action proceeds before the court on Defendant's Motion for Summary Judgment. (Doc. 21). In its Motion, Defendant argues that there exist no genuine issues of material fact supporting Plaintiff's claims of hostile work environment and negligent supervision, and therewith Defendant deserves judgment as a matter of law pursuant to the prevailing legal standards governing the claims. The court finds that Plaintiff suffered sexual harassment, but the Eleventh Circuit standard prevents this court from finding that she suffered a hostile work environment. Based upon the following discussion, the court **GRANTS** the motion.

### STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. Rule 56(a). Defendant, as the party seeking summary judgment, bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

A non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations,

the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

BACKGROUND

The undersigned sets forth the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to Plaintiff.

Plaintiff Deborah Williams began working at Defendant United Launch Alliance, Inc., (ULA) as an aerospace production technician in November 2010. As part of her hiring, Williams joined the Internal Association of Machinists and Aerospace Workers Union ("IAM"). IAM represents ULA's production technicians under a collective bargaining agreement that the union maintains with ULA. IAM also declared to Williams and her coworkers that they should bring any concerns or problems related to their employment with ULA to IAM, and IAM would then voice the concerns to ULA on the workers' behalf.

During Williams's initial orientation at ULA, ULA introduced Williams to the company's anti-harassment and anti-discrimination policies. ULA's policies state that

any employee who believes she has been harassed by anyone in the workplace should report the matter to management or Human Resources. Williams also received periodic refreshers of these policies, including a session in November 2012, and understood that she should follow these policies if she believed she had been harassed in the workplace.

ULA assigned Williams to work in the multi-layer insulation blanket shop ("blanket shop"), where Williams works with sewing machines and hand tools. Because ULA designated the blanket shop as a "clean room", ULA required Williams, as well as the other employees who worked in the blanket shop, to wear specific garments to ensure that the room remained sanitized and contaminant-free. Around August 2011, Brad Hawkins began serving as the blanket shop supervisor.

Towards the end of 2011, Hawkins began to sexually harass Williams. The harassment began with sexually evocative facial gestures at Williams while he squeezed oil bottles and said something along the lines of "ooh, this is juicy." Although Williams tried to ignore him, these types of comments occurred repeatedly. Around the same time, Hawkins told Williams and a coworker a joke about cows having sex. Williams tried to deflect and told Hawkins that the joke was inappropriate. Throughout the end of 2011, Mr. Hawkins continued to sexually harass Williams and her coworkers with sexual innuendos and facial gestures, though Williams could not recall the details of these innuendos.

Williams took two leaves-of-absence in 2012 due to health problems. Upon her return from her first leave of absence in July 2012, Hawkins approached Williams from

behind as she returned to her workstation from a break and informed her that he was doing a "butt block" for her. Williams grew uncomfortable and asked Hawkins what he meant, and he stated that he would block her butt so that nobody else could see it. Williams expressed her discomfort with the statement and told him to cease the remarks. During this same time period, Hawkins told Williams that she needed a "sugar daddy" and a "work husband," and that he could be hers. In an attempt to deter him from making further comments, Williams stated that she did not need one.

After she returned to work in October 2012 following her second leave-of-absence, Hawkins commented to Williams on two separate occasions that he asked a physician to place an extra stitch in his spouse's vagina to make it tighter for him after childbirth. Each time, Williams expressed her discomfort with Hawkins about those comments. During this same time period, Hawkins made a comment to Williams about how he would allegedly not allow her to work in another department because another employee, Jonathan, was known as a "hound dog" and he did not want Williams around Jonathan. Hawkins also frequently discussed Jonathan's sexual exploits around Williams, who felt increasingly uncomfortable with these comments and informed Hawkins about her discomfort.

Around Christmas 2012, Hawkins joked that he remained unsure about letting Williams complete overtime work in a different department because the male workers in that area would want to see her "down on all fours." Williams responded to the comment, and Hawkins laughed and repeated himself.

During the first few months of 2013, Hawkins addressed work quality issues with the employees in Williams's department. In April 2013, Williams and her coworkers noticed that Hawkins performed work on sewing machines that ULA reserved for union members. Around the same time, Williams and her coworkers approached an IAM representative to express their concerns about Hawkins's behavior. (Ex. A 65:6-23, 89:3-22, Ex. B). On April 30, 2013, two IAM union stewards notified Hawkins's supervisor, John Heslop, that they needed a meeting to discuss the concerns regarding Hawkins's behavior.

On May 6, 2013, two IAM union stewards met with Heslop and Cindy Lovell of ULA's human resources department to discuss the concerns that Williams and her coworkers shared about Hawkins's behavior. Without providing specific examples, the stewards notified ULA that Hawkins created a hostile work environment by uttering sexually explicit remarks that discomforted Williams and her coworkers.

On May 14, 2013, ULA commenced an investigation into the allegations that the union stewards brought forth during their meeting. Lovell served as the case manager for this investigation and interviewed Williams and five of her product technician coworkers. ULA ensured that at least one IAM union representative sat in on every interview. Lovell asked each individual the same questions regarding Hawkins's behavior and his treatment of the employees he supervised. Four of the product technician workers, including Williams, commented on Hawkins's unethical behavior in the workshop and his issuance of corrective orders to the technicians when he found

mistakes in their work. Williams, along with two of her coworkers, told Lovell that Hawkins made sexual comments to them. The two workers could not corroborate many of Williams's statements about what Hawkins said to her, but one of them had overheard Hawkins telling Williams that she needed a work husband.

In her interview with Lovell, Williams explained her concerns about Hawkins's untrustworthiness, his sharing of information about coworkers who were on leave, his working on sewing machines that ULA reserved for union work, and other workplace issues. Lovell also asked Williams whether Hawkins uttered any sexual comments towards her, and she mentioned three of the instances detailed above: (1) the "juicy" comment; (2) the "hound dog" comment; and (3) the vague joke about cows. However, the day after her interview, Williams sent Lovell an email adding two additional comments that Hawkins made to her: (1) the "butt block" comment; and (2) that Hawkins believed that the company did not need a union. Over the course of the investigation, Lovell expressed concerns about Hawkins's trustworthiness and honesty.

On June 18, 2013, an IAM representative emailed Darryl Boykins, a Human Resources Business Partner at ULA, with concerns about ULA's lack of action regarding the charges of sexual harassment against Mr. Hawkins. The following day, Lovell interviewed Hawkins and he denied the allegations. At the conclusion of her part in the investigation, Lovell documented her findings and determined that she could not find Williams's comments credible. Lovell based her determination on (1) Williams's interview; (2) Hawkins's denials, (3) the belief that some of Hawkins's comments were

not sexual; (4) the lack of witnesses who could corroborate Hawkins's comments; and (5) the fact that Williams did not directly report the comments to ULA's human resources department.

Lovell turned her final report over to ULA's Employee Corrective Action Review Team (ECART) for review. ECART consists of a panel of individuals who review an investigator's findings and issue recommendations for corrective action. ECART initially believed that Williams and her coworkers' complaints regarding Hawkins lacked credibility because (1) none of the employees that Hawkins supervised reported any of the alleged comments to Human Resources, which company policy requires; (2) the union did not lodge the complaints remotely contemporaneous to the period Hawkins uttered the remarks; and (3) the union lodged the complaints close to the period Hawkins criticized the workers' performance.

Boykins, an ECART member and Lovell's supervisor at the time, interviewed Hawkins. Boykins eventually found Hawkins's denials credible and reported this finding to ECART when it met again. ECART concluded that Williams's claims remained unsubstantiated; nevertheless, ECART issued an anti-harassment policy coaching to Hawkins that remained in his personnel file. Heslop administered this coaching to Hawkins in July 2013, and Williams testified that Hawkins did not utter any sexually suggestive comments after that time.

Throughout her employment with ULA, Williams received two verbal coachings for mistakes in her work, yet Williams never received any pay reduction, suspension, or

formal discipline as a result of these verbal coachings. Moreover, ULA has never issued any formal or written discipline against Williams.. Although Williams has remained continuously employed at ULA without any position change, Williams asserts that ULA retaliated against her by failing to hire her for any of the ten jobs that she applied for with ULA and The Boeing Company, one of ULA's parent companies, from 2011 to 2015.

In 2013, ULA discerned a potential contamination issue with a blanket shop product under Hawkins's supervision. Jan Garber, ULA's Ethics Officer, investigated the issue and presented her findings to ECART. Her findings documented Hawkins's dishonesty and numerous policy violations that stemmed from his actions following the blanket room contamination. Based on these findings, ECART terminated Hawkins's employment in January 2014.

With the encouragement of the IAM union stewards, Williams filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in September 2013. On June 26, 2015, the EEOC issued its determination and concluded that Hawkins sexually harassed Williams, and that his conduct created a hostile work environment because it was sufficiently severe and pervasive. The EEOC further concluded that ULA failed to take reasonable care to correct the harassment once it obtained corroborating information. The EEOC issued Williams her right to sue letter on November 27, 2015, after its conciliation attempt failed (Doc. 23-8 at 2), and she filed this complaint on February 15, 2016. (Doc. 1).

**Williams's Hostile Work Environment Claim Fails Because (1) Hawkins's Conduct Does Not Meet the "Severe and Pervasive" Standard and (2) ULA Successfully Satisfies the *Faragher-Ellerth* Defense.**

Title VII deems it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1). This provision "prohibits sex-based discrimination that alters the terms and conditions of employment." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir. 2007). An employee establishes a sex-based violation in either one of two ways: (1) by demonstrating a "tangible employment action" or (2) by demonstrating "a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions" of the workplace. *Nurse "BE" v. Columbia Palms W. Hosp., Ltd. P'ship*, 490 F.3d 1302, 1308 (11th Cir. 2007). Williams alleges ULA is liable for a hostile work environment caused by Hawkins's sexual harassment.

A plaintiff establishes a hostile work environment claim under Title VII upon proof that "discriminatory intimidation, ridicule, and insult [permeate the workplace in a manner] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)(quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). To establish a *prima facie* case of hostile work environment, a plaintiff must demonstrate:

> (1) that he or she belongs to a protected group; (2) that the
> employee has been subject to unwelcome sexual harassment,
> such as sexual advances, requests for sexual favors, and
> other conduct of a sexual nature; (3) that the harassment
> must have been based on the sex of the employee; (4) that
> the harassment was sufficiently severe or pervasive to alter
> the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) a
> basis for holding the employer liable.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 80 (11th Cir. 2010)(en banc)(quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(en banc)). ULA argues Williams fails to establish the second, fourth, or fifth elements of the *prima facie* case. The court addresses these arguments in turn.

*Hawkins Subjected Williams to Unwelcome Sexual Harassment*

As an initial matter, evidence of non-sexual, non-gender-based harassment cannot support a plaintiff's claim of sexual harassment. *Reeves*, 594 F.3d at 809. "In a case like this, where both gender-specific and general, indiscriminate [harassment] allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Id.* Workplace harassment—even harassment between men and women—does not automatically serve as evidence of sex-based discrimination merely because the words contain sexual content or invoke sexual connotations. *Id.* Instead, Title VII's test asks whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)).

Thus, Williams must prove her claim of sexual harassment with evidence of sexual or gender-based conduct. For conduct to rise to the level of sexual harassment, it must include "conduct of a sexual nature, and innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted." *Herron v. Morton*, 155 Fed.Appx. 423, 426 (11th Cir. 2005)(internal quotations omitted).

ULA first argues that Williams's harassment claim fails because Hawkins's comments prove insufficient to warrant actionable harassment. However, with the evidence drawn in the light most favorable to Williams, several of the incidents Williams encountered constitute inappropriate and vulgar sexual harassment: the sexual innuendo and facial gestures that Hawkins made to Williams and her female coworkers, the vague sexual joke about cows, the "butt block" comment, the "hound dog" comment, the comments about Williams needing a sugar daddy/work husband, his comments about his spouse's body, and the "all-fours" comment. Hawkins's alleged remarks reflecting his dislike of the union and his critical comments about Williams's work fail to reflect conduct of a sexual nature.

Furthermore, Lovell's interviews with Williams's other female coworkers strengthens the conclusion that Hawkins's comments constitute sexual harassment. Two of Williams's coworkers also indicated in their interviews that Hawkins expressed sexual remarks with them. ULA also provides no evidence that Hawkins made these types of comments to his male coworkers. Therefore, the court finds that a reasonable

factfinder could conclude based on the evidence that Hawkins subjected Williams to unwelcome sexual harassment.

*Hawkins's Sexual Harassment Was Not Sufficiently Severe or Pervasive*

The Eleventh Circuit emphasizes that Title VII does not serve as a "general civil code" and "'simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)' do not constitute a hostile work environment." *Guthrie v. Waffle House, Inc.,* 460 Fed. Appx. 803, 806 (11th Cir. 2012)(citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 778 (1998)). An employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct occurs in a manner "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Mendoza*, 195 F.3d at 1245 (internal citations omitted). This element contains subjective and objective components. *Terry v. Laurel Oaks Behavioral Health Center, Inc.*, 1 F. Supp. 3d 1250, 1264 (M.D. Ala. 2014)(citing *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002)). Thus, the employee must subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms or conditions of employment, and this subjective perception must stand as objectively reasonable. *Reeves,* 594 F.3d at 809. "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Id.* (quoting *Harris*, 510 U.S. at 22). The objective component requires that the harassment results in an

"environment that a reasonable person would find hostile or abusive." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009).

ULA only challenges the "objective" prong of the test, arguing that Williams fails to show that these comments proved sufficiently severe or pervasive enough to alter the terms and conditions of her employment and create an abusive working environment. When evaluating the objective component, the court examines the circumstances in totality, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Miller*, 277 F.3d at 1276.

The alleged "severe or pervasive" statements and remarks must manifest sexual or gender-related content. *Flippo v. American Power Source, Inc.*, 20 F. Supp. 3d 1299 (N.D. Ala. May 12, 2014)(citing *Mendoza*, 195 F.3d at 1245). This narrows down the conduct that this court may consider to the sexual-based comments mentioned in the prior section. Construing the evidence in the light most favorable to Williams, there exists no genuine issue of material fact that Hawkins's alleged conduct proves insufficiently severe or pervasive to support recovery on a hostile work environment theory.

As to the first factor, Williams stated in her deposition that she recalled seven specific instances where Hawkins uttered remarks of a sexual nature, yet she could vaguely remember ten to twenty more instances that occurred between late 2011 and April 2013. (Pl. Dep. at 164, ll. 1-24). Williams also testified that Hawkins uttered these

types of remarks on a "daily" basis, but she narrows down the number of times to approximately twenty. Drawing all inferences in Williams's favor, the alleged harassment occurred approximately ten to twenty times over eighteen months.[1]

This ratio falls far below the harassing conduct that this Circuit finds sufficient to constitute pervasive harassment. *See Reeves*, 525 F.3d at 1446 (three years of daily harassing conduct); *Parker v. Atlanta Newspapers Name Holding Corp.*, No. 05-15722, 2006 WL 1594427, *4 (11th Cir. June 12, 2006)(unwelcome conduct made "every single time [plaintiff] was at work" for a period of several months); *but see Latreæ Lockett v. Choice Hotels In'tl,* 315 Fed. Appx. 862, 866 (11th Cir. 2009)(alleged harassment that occurred multiple times a week for approximately four months was not frequent). The court therefore concludes that Hawkins's conduct fails to meet the pervasive prong.

As to the second factor, Hawkins's alleged conduct fails to meet the severity prong. Williams cites no cases that demonstrated the potential severity of Hawkins's conduct. Furthermore, Hawkins's conduct exhibits far less severe behavior than that deemed insufficient in this Circuit to establish a hostile work environment claim. *See*

---

[1] The undersigned finds that Williams's general statements that Hawkins harassed her "daily" and that she could not remember all of the remarks he uttered because "there were so many" are too general to review under the severe or pervasive prong. The Eleventh Circuit has stated on multiple occasions in the context of the severe or pervasive prong that "[t]he employee must present concrete evidence in the form of *specific facts*, not just conclusory allegations and assertions." *See, e.g., Godoy v. Habersham County*, 211 Fed. Appx. 874, 877 (11th Cir. 2006); *Buckhanon v. Huff & Assocs. Const. Co., Inc.*, 506 F. Supp. 2d 958, 965 (M.D. Ala. 2007); *see also Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 477 n.24 (D. Md. 2002)("General allegations lacking in dates, times, and circumstances are without the particularity required to support a claim of . . . harassment."). Williams's general assertions about ULA's conduct do not meet this standard because Williams fails to cite specific facts as to what constituted Hawkins's alleged "daily" harassment and numerous inappropriate comments. As such, the undersigned does not consider these vague assertions in the analysis of the severe or pervasive prong.

*Lockett*, 315 Fed. Appx. At 834-64 (11ᵗʰ Cir. 2009)(holding that supervisor's comments about sexual positions, that "he would go down on [her] good," that her boyfriend "ain't F'ing [her] right," and that she needed "to get with a real guy" were offensive but not severe); *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1027-28 (11ᵗʰ Cir. 2008)(finding that supervisor's comments that plaintiff would "be better if she'd wear tighter clothes," "looked hot," and would get time off if she wore tighter clothes—which persisted at least weekly for eight weeks—and a comment to plaintiff's husband about what the supervisor was sexually doing to his wife were not severe and pervasive) *cert. denied*, 128 S. Ct. 2444 (2008); *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1302 (11ᵗʰ Cir. 2007)(holding that the following conduct was not sufficiently severe: a supervisor propositioning an employee at a company banquet and asking her to spend the night in his hotel room while on the drive home, cornering her in his office, and approaching her from behind several times at work while breathing down her neck); *Dar Dar v. Associated Outdoor Club, Inc.*, 248 Fed. Appx. 82, 85 (11ᵗʰ Cir. 2007)(finding co-workers touching plaintiff on the buttocks twice, asking plaintiff if she wore panties with a "built-in butt," and telling plaintiff about co-worker's genital size did not constitute severe behavior); *Mitchell v. Pope*, 189 Fed. Appx. 911, 913-14 & n.3 (11ᵗʰ Cir. 2006)(affirming summary judgment for employer where employee alleged her supervisor made sexually overt statements, such as "your a** sure does look fine" and describing the sexual effect she had on him, and engaged in conduct, such as trying to kiss her, lifting her over his head, rubbing up against her, and reaching across her chest);

*see also Mendoza,* 195 F.3d at 1246-47 (citing thirteen cases from other circuits where abhorrent conduct, although sexually charged, does not amount to sexual harassment under Title VII). Just as the conduct in the cited cases does not alter the terms and conditions of employment, the prevailing standard in this Circuit renders the conduct at issue in this case insufficient as well.

Third, Williams provides no evidence indicating that Hawkins touched her inappropriately or that his conduct was "physically threatening or humiliating." Williams's complaints about Hawkins's conduct focus solely on his statements and gestures. She contends that his sexually explicit remarks discomforted her, yet Williams's discomfort unfortunately does not satisfy the prevailing standard. In *Latreæ Lockett*, the Eleventh Circuit affirmed summary judgment in favor of the defendant-employer, noting that the defendant's conduct was not physically threatening or humiliating even when a plaintiff's coworker made repeated sexually explicit comments to her and referred to plaintiff as a "ho" and "'jumped in [the plaintiff's] face and acted like he was going to hit [the plaintiff.]'" *See Latreæ Lockett*, 315 Fed. Appx. at 864, 866. Hawkins's alleged conduct manifests less crude and offensive, and Williams provides no evidence that Hawkins threatened her.

Finally, Williams must show that the cumulative effect of Hawkins's conduct "unreasonably interfered" with her job duties. *See Harris,* 510 U.S. 17, 23. This fourth element "tests the mettle of most sexual harassment claims." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11ᵗʰ Cir. 2000), *overruled on other grounds by Burlington N. & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Conduct need not tangibly affect a plaintiff's job performance to constitute evidence of the job performance prong. *See Reeves*, 525 F.3d at 1147. Factors that demonstrate that conduct interfered with job performance include being unable to concentrate on work, shaking because of co-worker conduct, taking time away from work to complain to superiors and coworkers, and writing notes to keep a record of conduct. *Id.*

Williams does not identify any evidence exhibiting this type of behavior. Williams either ignored Hawkins's comments or responded by informing him that those comments were inappropriate. Williams mentions a verbal coaching (referred to as a PIRS) she received for a mistake in her job performance. This coaching occurred in June 2013, shortly after Hawkins identified a mistake in Williams's work, and Williams believed this discipline reflected retaliation by Hawkins. However, this coaching served as the first and only time that Hawkins issued any type of negative review about her work, and Williams never received any pay reduction, suspension, or formal discipline.

Williams argues that Hawkins's supervisory authority, coupled with ULA's knowledge of the EEOC claims Williams filed, possibly contributed to the denials Williams received for the jobs she applied for with ULA and The Boeing Company ("Boeing") from 2011 to 2015. Ostensibly, Williams broaches this argument to demonstrate the existence of a tangible employment action emanating from Hawkins's sexual harassment. However, ULA's response to this claim emphasized that ULA contributes no input into Boeing's employment decisions, and Williams provided no

evidence to disprove ULA's response. Furthermore, Williams only recalled one job that she bid for within ULA—a lateral transfer to the foam shop. Williams expressed displeasure ULA denied her candidacy for that position, but she also acknowledged that the employee who won the bid enjoyed more seniority than her. Williams provides no further evidence that Hawkins's conduct interfered with her work. While Hawkins's behavior remains inappropriate and unwelcomed, the evidence does not demonstrate it resulted in a tangible employment action.

Williams argues that this court should give significant weight to the EEOC's findings, which stated that Hawkins's conduct constituted severe and pervasive behavior that created a hostile work environment. Williams refers to a Fifth Circuit case that deems it "wasteful and unnecessary" to "ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators in the area of discriminatory employment practices." *Smith v. Universal Servs., Inc.*, 454 F.2d 154, 157 (5th Cir. 1972).

However, in assessing the merits of a plaintiff's Title VII claims, a court does not have to defer to the EEOC's determination of its merits. *Muhammad v. Audio Visual Services Grp.*, 380 Fed. Appx. 864, 873 (11th Cir. 2010)(citing *Moore v. Devine*, 767 F.2d 1541, 1549-51 (11th Cir. 1985), *modified on reh'g*, 780 F.2d 1559, 1560 (11th Cir. 1986)); *see also Price v. Federal Exp. Corp.*, 283 F.3d 715, 719 & 725 (5th Cir. 2002); *Miller v. Eagle Tug Boat Cos.*, No. 09-00401-CG-B, 2010 WL 4269156, *4 (S.D. Ala. Oct. 25, 2010)(finding

that the EEOC report did not determine certain elements of the claim, and therefore the evidence lacked significant probative value).

In the present case, the court reviewed the depositions and affidavits pursuant to the Eleventh Circuit's prevailing standard for hostile work environment claims. Although the EEOC determination provides colorable evidence of a hostile work environment, the Eleventh Circuit's standard controls. As a result, the court finds that Hawkins's conduct towards Williams fails to rise to the severe or pervasive standard for hostile work environment claims.

*ULA Prevails on its Affirmative Defense*

ULA also invokes the *Faragher-Ellerth* affirmative defense. The Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998). However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Id.* The defense comprises of two necessary elements: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided or to avoid harm otherwise. *Fodor v. Eastern Shipbuilding Group*, 598 Fed. Appx. 696, 696 (11th Cir. 2015) (internal citations and

quotations omitted). "As an affirmative defense, the defendant bears the burden of establishing both of these elements." *Nurse "BE" v. Columbia Palms W. Hosp., Ltd. P'ship*, 1302, 1309 (11th Cir. 2007).

Because ULA bears the burden of proof on its affirmative defenses, its status as the summary-judgment movant requires it to establish there is no genuine dispute of material fact as to all of the elements of its affirmative defense and, concomitantly, that it deserves judgment as a matter of law on the defense. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) ("The movant must show . . . on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.").

The first prong of the affirmative defense requires a showing that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Nurse "BE"*, 490 F.3d at 1308 (internal quotation marks omitted). This prong breaks down into two parts: reasonable care to prevent harassment, and reasonable care promptly to correct harassment once the employer identifies it. *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2011). An employer demonstrates that it exercised reasonable care to prevent sexual harassment by disseminating a sexual harassment policy with reasonable complaint procedures that were "effectively published . . . [and] contained no other fatal defect." *Id.* at 2014. A policy contains reasonable complaint procedures if it provides alternative avenues to report sexual harassment in the event the harasser is an employee's supervisor. *See Green v. MOBIS*

*Alabama, LLC*, 995 F.Supp.2d 1285, 1301 (M.D. Ala. 2014)(finding policy complied with EEOC guidelines by instructing employees to promptly report sexual harassment "to the aggrieved Team Member's Supervisor, Department Manager, Team Relations Department, or HR.").

Neither party disputes the fact that ULA disseminated its policy. Williams received the policy when ULA initially hired her, and she received annual training on the policy and other ethics topics. ULA's policy also contains reasonable complaint procedures. ULA's policy defines sexual harassment, prohibits it, and also instructs employees to promptly report sexual harassment "to his/her immediate supervisor, another member of management, their Human Resource Business Partner, Ethics Officer, and/or the ULA EEO/Diversity Program Office." (Doc. 22-2, at 94). The written policy allows the complaining employee to report the harassment to company officials other than the employee's supervisor in the event that the supervisor is the harasser. *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir. 2000) (discussing importance of policy that encourages victims to come forward without requiring victim to complain first to the offending supervisor). Because ULA's policy provides alternative avenues for reporting harassment, ULA satisfies the first prong of the first element of the *Faragher-Ellerth* defense.

For the second part of the first element of the defense, an employer need not act instantaneously, but "must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick*, 246 F.3d at 1314. ULA's burden requires a showing

22

that ULA "acted reasonably promptly on [Williams's] complaint when it was given proper notice of her allegations as required under its complaint procedures." *Id.* Determining if harassment occurred constitutes a threshold step in correcting harassment, and that undertaking requires an investigation deemed reasonable when considering the individual circumstances. *Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1306 (11th Cir. 2007). In *Baldwin*, the Eleventh Circuit elaborated upon this requirement of a reasonable investigation:

> The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser. Nothing in the *Faragher-Ellerth* defense puts a thumb on either side of the scale in a he-said, she-said situation. The employer is not required to credit the statements on the she-said side absent circumstances indicating that it would be unreasonable not to do so.

*Id.* at 1303-04.

Williams seemingly contests this point in her response to ULA's motion, arguing that ECART's decision to believe Hawkins's denials and conclude that Williams's allegations remained unsubstantiated proves that ULA failed to take Williams's claims seriously. Although Williams accurately states that two of her other coworkers expressed concerns about Hawkins's alleged sexual harassment, neither coworker could corroborate the statements Hawkins uttered to Williams. Furthermore, the time gap between Hawkins's utterance of these statements and Williams's report to IAM also concerned ULA.

23

Williams also contests the reasonableness of ULA's investigation timeline. The IAM union representatives met with Heslop and Lovell on May 6, 2013, where they mentioned Williams and her coworkers' concerns about Hawkins's behavior. Eight days later, ULA's HR department commenced an investigation and interviewed Williams and six of her product technician coworkers. Even when Lovell interviewed Williams, Williams did not mention all of the allegedly sexual comments Hawkins uttered to her.

Williams emphasizes ULA failed to interview Hawkins until a month after the investigation commenced, after an IAM union representative prompted ULA by emailing concerns about the investigation's pace. However, as seen in the evidence, ULA engaged other facets of the investigation during that time, including attempting to trace emails and instant messages that could help corroborate Williams and her coworkers' concerns. After concluding the investigation in July 2013, ULA formally coached Hawkins, and any alleged comments from Hawkins ceased. The court finds that ULA took prompt corrective action upon the conclusion of its meeting with the IAM union representatives by interviewing workers Hawkins supervised, including Williams, and then investigating the incident.

Moreover, "even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the [*Faragher-Ellerth*] defense is still available if the remedial result is adequate . . . In other words, a reasonable result cures an unreasonable process." *Baldwin*, 480 F.3d 1287, 1305 (11th Cir. 2007). The court

deems a remedial measure adequate if it is "reasonably likely to prevent the misconduct from recurring." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996)(quotation and citation omitted). Here, Williams concedes that after Hawkins received counseling on the company harassment policy, he ceased the sexual remarks and gestures. Therefore, because the court finds that ULA exercised reasonable care to prevent and to promptly correct sexual harassment, ULA meets the first element of the *Faragher-Ellerth* defense.

To establish the second element of the defense, the employer must show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. An employee's failure to take advantage of preventive or corrective measures manifests in two forms—not using the procedures in place to promptly report any harassment and not taking advantage of the reasonable corrective measures the employer offers after the employee reports the harassment. *Baldwin*, 480 F.3d at 1306 (11th Cir. 2007). "As to the second element of the defense, an employer's showing that the plaintiff-employee failed to follow its complaint procedures will often be sufficient to satisfy its burden" *Frederick*, 246 F.3d at 1314. A plaintiff's failure to report harassment within a certain timeframe can establish the second element of the defense.[2] *Baldwin*, 480 F.3d at 1306.

_____

2 The Eleventh Circuit in *Baldwin* further held that the Supreme Court built this prompt reporting

An employee must comply with the reporting rules and procedures that her employer established. *See Frederick*, 246 F.3d at 1314 (citing *Madray*, 208 F.3d at 1302; *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361 (11th Cir. 1999)(per curiam)). Here, ULA imposed a prompt reporting duty for its employees under its sexual harassment policy: if an employee believes that she has been subjected to sexual harassment, she must report that conduct "as soon as possible (preferably within three business days of the conduct) to enable the Company to investigate and timely correct any behavior that may be in violation of this policy." (Doc. 22-2 at 94). In this case, Williams's complaint to the IAM union in April 2013 occurred nearly sixteen months after Hawkins allegedly began harassing Williams and four months after the "all fours" comment—the most recent of the remarks Williams reported during the investigation. This lengthy waiting period not only fails to comply with ULA's policy, but it also falls far outside the acceptable

---

duty into Title VII through its prophylactic rules in the *Faragher* and *Ellerth* decisions:

> The rules of those decisions place obligations and duties not only on the employer but also on the employee. One of the primary obligations that the employee has under those rules is to take full advantage of the employer's preventative measures. The genius of the *Faragher-Ellerth* plan is that the corresponding duties it places on employers and employees are designed to stop sexual harassment before it reaches the severe or pervasive stage amounting to discrimination in violation of Title VII. *See Ellerth*, 524 U.S. at 764 (limiting employer liability where the employee fails to comply with reporting requirements "encourage[s] employees to report harassing conduct before it becomes severe or pervasive" and serves Title VII's deterrent purpose. But that design works *only if employees report harassment promptly*, earlier instead of later, and the sooner the better.

*Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1306-07 (11th Cir. 2007) (emphasis added).

26

timelines that the Eleventh Circuit recognizes. *See, e.g.*, *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1289-91 (11th Cir. 2003)(an employee's reporting delay of two and a half months after the first incidents of harassment was too long for *Faragher-Ellerth* purposes); *Baldwin*, 480 F.3d at 1307 (three month delay was too long).

Williams states that she waited to report her complaints about Hawkins to her union representative because she believed that ULA would ignore her claims and potentially fire her for reporting Hawkins's conduct. She claims that she based this belief on knowledge of how ULA handled similar complaints that her coworkers made directly to ULA. These "[s]ubjective fears of reprisal . . . standing alone, do not excuse an employee's failure to report a supervisor's harassment." *Walton*, 347 F.3d at 1291. While the Eleventh Circuit recognizes that filing a sexual harassment complaint may be "uncomfortable, scary, or both," *Id.* at 1290 (internal quotations omitted), it explains that the problem of workplace discrimination "cannot be [corrected] without the cooperation of the victims." *Id.* (quoting *Madray*, 208 F.3d at 1302)(omission and alteration in original)). Therefore, it nonetheless requires that an employee must lodge complaints if she wants to impose vicarious liability on her employer in the absence of a tangible employment action. *See Baldwin*, 480 F.3d at 1307.

ULA also argues that Williams failed to follow policy when she complained to the IAM union representatives instead of using the options listed in ULA's written policy. Williams argues that it was reasonable for her to discuss her employment issues

with the union representatives, because the ULA workers viewed it as "common practice and procedure" to bring their issues to IAM.

This case differs materially from the cases ULA invokes to support its argument that Williams's complaint to IAM constitutes an unreasonable failure to follow ULA's policies. ULA's cases involve employees reporting their complaints to either mid-level employees or union stewards who, once upon receiving an employee's complaint of harassment, failed to directly report this complaint to the employer. *See Madray*, 208 F.3d at 1300 (holding that Publix leadership was not put on notice about plaintiffs' sexual harassment complaints when they reported it to various mid-level managers who did not promptly report it); *Speigner v. Shoal Creek Drummond Mine*, 402 Fed. Appx. 428, 430 (11th Cir. 2010)(plaintiff complained of alleged sexual harassment to union steward, but asked the steward to not process the grievance out of fear of retaliation); *Maddin v. GTE of Florida, Inc.*, 33 F. Supp. 2d 1027, 1033 (M.D. Fla. 1999)(plaintiff filed a grievance over her termination through her union, but the union dropped the grievance). These cases presented the issue whether a plaintiff's report of harassment to her union supervisor constituted sufficient notice to the employer. Contrary to those cases, once Williams and her coworkers proceeded with their grievances regarding Hawkins, IAM union representatives scheduled a meeting with ULA's HR representatives a week later. The union representatives proceeded with Williams's complaints and were even present during the interviews with Lovell. Therefore, the court remains unconvinced that

Williams's decision to report this grievance to her union representatives instead of directly to ULA leadership constituted an unreasonable failure to follow policy.

However, Williams still waited an unreasonable amount of time before reporting this harassment. Her fear of retaliation proves insufficient to overcome her delayed reporting, and the court therefore finds that ULA satisfied the second element of the *Faragher-Ellerth* defense.

For these reasons, there exists no genuine dispute of material fact that ULA established both elements of the *Faragher-Ellerth* defense, and on that basis the court **GRANTS** ULA summary judgment on Williams's claim of sexual harassment.

## Williams's Negligent Supervision and Training Claim Fails as a Matter of Law Because Hawkins Did Not Commit a Tort under Alabama Law.

ULA moves for summary judgment on Williams's claims for negligent supervision and training on the basis that Hawkins did not commit a tort against Williams. Williams's complaint alleges that ULA failed to adequately train and/or educate Hawkins regarding the proper supervision of ULA's employees, Williams's rights, and other federal and state employment laws.

To establish a negligent supervision and training claim, Alabama law requires that the alleged, derelict employee engage in tortious conduct. *Stevenson v. Precision Std., Inc.*, 762 So. 2d 820, 824 (Ala. 1999)(citing *Big B., Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993)). The underlying wrongful conduct must constitute a "common-law, Alabama tort," not a federal cause of action such as Title VII. *Ellis v. Advanced Tech. Servs.*, No.

3:10-cv-555-WHA, 2010 WL 3526169, at *2 (M.D. Ala. Sept. 3, 2010)(quoting *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)). In *Guy v. Alabama Power Co.*, No. 2:13-cv-8-MHT, 2013 WL 3929858, (M.D. Ala. July 29, 2013), the Middle District of Alabama expounded on this Alabama-based law requirement:

> It is clear that the employee's wrongdoing must be based on state, and not federal, law. Otherwise, the tort of negligent or wanton hiring, training, and supervision could be a corridor through which federal laws prohibiting various types of conduct by employees could be incorporated into state law as a privately redressable requirement on employers to stop their employees from engaging in such conduct.

*Guy*, 2013 WL 3929858 at *2. Without an underlying tort claim, an employee's claim of negligent hiring, supervision, and/or training fails. *Trainer v. Supreme Beverage Co.*, 2:11-cv-00057-WMA, 2013 WL 169288, *19 (N.D. Ala. Jan. 10, 2013).

Alabama does not recognize an independent cause of action for sexual harassment. *Ex parte Carlisle*, 26 So.3d 1202, 1204 n.1 (Ala. 2009). Accordingly, ULA garners summary judgment on plaintiff's negligent hiring and training claims because Hawkins has not committed a tort under Alabama law. Decisions from the Northern, Middle, and Southern Districts of Alabama concur with this reasoning. *See Burnett v. Harvard Drug Grp., LLC.*, No. CV-13-S-1620-NE, 2014 WL 223081, at *5-6 (N.D. Ala. Jan. 21, 2014)(holding that because plaintiff based his negligent hiring and training claims on the same alleged conduct that supported his claim for hostile work environment under Title VII, plaintiff does not allege any conduct that supports an Alabama tort law claim and his claims therefore fail); *Rabb v. Georgia Pacific, LLC,* No.

CA-09-0420-C, 2010 WL 2985575, *16 (S.D. Ala. July 26, 2010)("Because Alabama does not recognize a common-law tort for race discrimination in employment, this Court finds that Rabb cannot maintain an action for negligent supervision 'based upon conduct that is employment discrimination, but does not support a common-law tort.'") (quoting *Thrasher*, 195 F. Supp. 2d at 1320).

Therefore, because Williams fails to identify an Alabama law under which Hawkins committed a tort, Williams's negligent training and supervision claims cannot proceed. The court **GRANTS** ULA summary judgment on Williams's negligent training and supervision claims.

## CONCLUSION

For the foregoing reasons, the court GRANTS ULA's Motion for Summary Judgment. The court will issue a final judgment in a separate order.

**DONE** and **ORDERED** this 6th day of February, 2018.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE